IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    PLAINTIFF,<br><br>        v.<br><br>$697,165.89 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXX8543 HELD IN THE NAME OF ON SOLUTIONS GROUP LLC,<br>    DEFENDANT. | Civil Action No |

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW, the United States of America, Plaintiff in the above-styled civil action, and shows the Court the following in support of its Verified Complaint for Forfeiture:

### INTRODUCTION

1. On or about December 20, 2021, agents with the United States Department of Homeland Security – Homeland Security Investigations ("HSI") seized $697,165.89 in funds from Bank of America account number XXXXXX8543 held in the name of On Solutions Group LLC (hereinafter, "Defendant Funds")

1

pursuant to a Federal seizure warrant obtained in connection with a criminal investigation into a drug trafficking organization.

2. The Defendant Funds are presently located within the jurisdiction of this Court and in the custody of the United States Customs and Border Protection ("CBP").

3. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355.

4. This Court has *in rem* jurisdiction over the Defendant Funds pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

## FORFEITURE STATUTES

6. The Defendant Funds are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or intended to be furnished in exchange for a controlled substance, constitute proceeds traceable to such an exchange, or were used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and 846.

7. The Defendant Funds also are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or were derived from proceeds traceable to a violation of a "specified unlawful activity."

8. 18 U.S.C. § 1956(c)(7) defines, in relevant part, a "specified unlawful activity" as any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).

9. 18 U.S.C. § 1961(1) includes, as part of the list of offenses, "dealing in a controlled substance or listed chemical."

10. The Defendant Funds also are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and 1957 (money laundering), or as property traceable to such property.

## BASIS FOR FORFEITURE

### A. The Investigation

11. Since on or about early December 2020, HSI has been investigating a vast network of U.S.-based companies that have been receiving millions of dollars via bulk cash deposits in an unusually frequent and suspicious pattern since at least 2018.

12. Most of the cash deposits occurred in cities historically known for drug trafficking activity, such as Los Angeles, California; Chicago, Illinois;

Atlanta, Georgia; Miami, Florida; and, New York City, New York.

13.     The investigation revealed that those cash deposits were proceeds derived from suspected narcotics trafficking, and that the companies receiving the deposits laundered the funds as part of a Black-Market Peso Exchange (BMPE) operation benefitting a Latin American drug trafficking organization (DTO).

14.     BMPE is a specific form of trade-based money laundering, which is an umbrella term used to describe the many ways money laundering organizations (MLO) can manipulate business records, import/export records, and other business processes to hide narcotics proceeds within seemingly legitimate enterprises that conduct international business.

15.     BMPE activities usually have the following indicators:

- Shell corporations that lack any internet presence but claim to be in an industry heavily associated with international commerce (electronics, textiles, etc.).

- Interstate cash deposits occurring on the same day or within a narrow timeframe.

- Structured cash deposits into U.S. business bank accounts by individuals using fraudulent passports in attempt to conceal

their identity.

- Significant and repetitive cash deposits and/or Currency Transaction Reports, peer-to-peer bank transfers, or deposits that otherwise seem unusual for the given industry.

- Immediate wire transfers after receiving cash deposits to high-risk countries in Latin America.

- Use of pass-through accounts to conceal the origin and destination of narcotics proceeds.

- Discrepancies on wire transfer memo lines - for example, one wire transfer memo line may state "purchase of hand sanitizer," while the next memo line states "purchase of used vehicles."

- Periods of high-volume activity (deposits and wire transfers) followed by periods of cessation of activity.

- Foreign visitors to the United States opening bank accounts while on temporary or restricted visa status.

16. Irrespective of the various methods listed above, MLOs must recruit individuals to incorporate U.S.-based companies, open business checking accounts, safeguard bulk cash, receive and count bulk cash, transport bulk cash,

as well as deposit the bulk cash into bank accounts or conduct wire transfers to counterparties internationally. MLOs recruit many individuals to play various roles in the processes. As explained later, MLOs may recruit these individuals without providing specific details of the activity in which they are involved. These individuals may be aware of the purpose of the activity from the beginning or become aware to the purpose as certain red flags appear, or these individuals may be unaware of this process entirely.

17. As a part of the investigation, HSI identified several individuals involved in the bulk deposits of cash into various bank accounts. One of these individuals, a Source of Information (SOI-1), admitted depositing millions of dollars into bank accounts associated with several U.S.-based companies in 2020.

18. In or around late 2020, HSI investigators found a large stack of bank deposit slips from JPMorgan Chase, Bank of America, and PNC Bank, as well as a receipt for a wire transfer at a money services business, related to SOI-1.

19. According to the SOI-1, she/he received and deposited bulk cash for a money laundering organization over an extended period of time.

20. The SOI-1 conducted that activity under the direct control of a Mexican DTO, which the SOI-1 believed to be the Mexican Los Zetas Cartel.

21. The SOI-1 claimed she/he was recruited in early 2020, hoping to

make extra money and work more stable hours.

22. As a condition of accepting the recruiter's job, the SOI-1 was required to bring on one additional person to assist with the work.

23. The SOI-1 recruited another individual, Co-Conspirator 1 ("CC1").

24. The SOI-1 and CC1 left their jobs, received airplane tickets from their recruiter, and traveled to Atlanta, Georgia.

25. In early 2020, the SOI-1 and CC1 met with two unidentified individuals, as well as their recruiter, at an Atlanta restaurant.

26. During the meeting, the two individuals informed the SOI-1 and CC1 that they would receive large sums of cash daily, and that they were required to receive, count, identify and remove counterfeit currency, and then deposit the money into bank accounts.

27. Soon thereafter, SOI-1 and CC1 received instructions as to which bank accounts they were to deposit the money, as well as training on how to conduct money pickups, search collected money for counterfeit currency, and how to prepare the collected money into $1,000 to $10,000 bundles for bank deposits.

28. They were further instructed to keep the deposits under $10,000 to avoid "red flags" at the bank.

29. The "red flag" reference likely related to the filing of a Currency Transaction Report which is required for bank transactions exceeding $10,000.

30. After receiving their training, SOI-1 and CC1 began working without supervision.

31. The SOI-1 and CC1, working in tandem, received daily text messages with instructions to make various pickups, usually in public parking lots, at different times, that totaled approximately $100,000 to $250,000 of currency per day.

32. The SOI-1 and CC1 then deposited the money in the various bank accounts that they had been provided.

33. SOI-1 received a 1% commission on the money she/he deposited into the bank accounts. The MLO set that commission rate.

34. As part of the money laundering process, SOI-1 and CC1 would first provide pictures of U.S. dollar bill serial numbers in their possession to the MLO.

35. SOI-1 and CC1 would then receive instructions from the MLO to meet a money courier in a public parking lot.

36. Upon meeting the courier, SOI-1 and CC1 would provide one of the specific U.S. dollar bill serial numbers to the money courier to confirm their identity for the exchange of the cash.

37. SOI-1 and CC1 would then count the money and receive specific instructions into which bank accounts they were to deposit the funds.

38. SOI-1 and CC1 used "burner" phones to text pictures of the cash and deposit receipts to their handlers working for the MLO.

39. SOI-1 and CC1 also utilized an encrypted phone application, which automatically deletes the messages after a certain time, to communicate with the MLO.

40. SOI-1 and the CC1 traveled between Atlanta and several large metropolitan cities in the United States to engage in this activity.

41. The MLO determined where to send SOI-1 and CC1 based on which cities were "dry," or lacking a significant amount of drug proceeds to launder.

42. SOI-1 and CC1's travel, lodging, and occasional food expenses were paid by the MLO.

43. After a few weeks of depositing money, the SOI-1 felt that she/he had made a mistake in accepting this work opportunity, and within a few weeks the SOI-1 realized that she/he was likely working for a Mexican DTO or MLO to launder drug proceeds. However, SOI-1 continued to make deposits into various bank accounts as directed.

44. Because SOI-1 conducted money pickups from different individuals,

and the money was so excessive in quantity, SOI-1 realized that there was no legitimate business purpose for the activity, and she/he was in fact laundering drug proceeds.

45. In November 2021, HSI investigators encountered an individual in Miami, Florida, hereafter identified as SOI-2, who admitted to conducting money pickups throughout the United States for who she/he believed to be a Colombian-based DTO importing cocaine into the United States. SOI-2 consensually provided information about the DTO/MLO.

46. Like SOI-1, SOI-2 described an intricate process that involved receiving instructions from money brokers overseas who provided SOI-2 with the contact information for individuals in the United States who were safeguarding large quantities of narcotics proceeds.

47. After receiving the contact information for these individuals, SOI-2 would meet with them in public parking lots to collect the narcotics proceeds. HSI Atlanta investigators reviewed photographic evidence of a bulk currency pickup conducted by SOI-2. HSI investigators observed characteristics similar to most cartel-related pickups, including duffel bags of neatly stacked bills in lower denominations ($10-20s) and $1 dollar bills used to verify transactions.

48. After receiving the proceeds, SOI-2 took the funds back to a hotel

room to be counted and bundled into specific deposit amounts.

49. After organizing the money, SOI-2 received instructions from the overseas money brokers into which accounts to deposit the proceeds. Often, the money brokers instructed SOI-2 to structure the money below the $10,000.00 Currency Transaction Reporting ("CTR") threshold. SOI-2 stated she/he also received a 1% commission for every deposit she/he made.

50. Like SOI-1 and CC-1, SOI-2 admitted she/he did not have any legitimate income during the time period in which she/he collected and deposited these proceeds.

51. On September 21, 2020, as part of a consensual search of a residence in Chicago, Illinois, related to CC-1, Drug Enforcement Administration ("DEA") investigators recovered multiple small backpacks and suitcases, a money counter, several financial ledgers showing deposit activity, and bank deposit slips, all items commonly found with individuals involved in the laundering of illicit money.

52. The recovered documents included financial ledgers which referenced bulk cash deposits into over 100 different business accounts, including Bank of America account number XXXXXX8543 held in the name of On Solutions Group LLC (hereinafter, "Subject Account"). Additionally, DEA

investigators recovered bank deposit slips referencing the specific time, place, and account number for some of the bulk cash deposits into the Subject Account.

53. Based on a review of the relevant bank documents, HSI investigators identified the following cash deposits in the Subject Account:

   a. A handwritten reference in the ledger notebook identified Subject Account by its account number. Next to the account number is included the amount of $27,000.00. Below the account number are listed deposit amounts of $9,000.00, $7,000.00, $6,000.00, and $5,000.00.

   b. A recovered bank deposit slip showing a deposit of $9,000.00 in the Subject Account on September 21, 2020 at 10:50 a.m.

   c. A recovered bank deposit slip showing a deposit of $7,000.00 in the Subject Account on September 21, 2020 at 11:18 a.m.

   d. A recovered bank deposit slip showing a deposit of $6,000.00 in the Subject Account on September 21, 2020 at 11:48 a.m.

   e. A recovered bank deposit slip showing a deposit of $5,000.00 in the Subject Account on September 21, 2020 at 12:11 p.m.

   f. A handwritten reference in the ledger notebook identifying the Subject Account by its name ("BofA – On Solution Group"). Next to

       the account name is listed the amount of $3,380.00.

    g. A handwritten reference in the ledger notebook identifying the Subject Account by its name ("BofA – On Solutions Group"). Next to the account name was written the amount of $17,113.00.

54. Additionally, HSI investigations recovered photos from a cellphone possessed by SOI-2 which depicted bank deposit slips for structured cash deposits into the Subject Account. These photos revealed the following deposits:

    a. A photograph of a recovered bank deposit slip showing a deposit of $10,000.00 in the Subject Account on June 22, 2021 at 9:26 a.m.

    b. A photograph of a recovered bank deposit slip showing a deposit of $10,000.00 in the Subject Account on June 22, 2020 at 9:30 a.m.

    c. A photograph of a recovered bank deposit slip showing a deposit of $10,000.00 in the Subject Account on June 22, 2021 at 9:30 a.m.

    d. A photograph of a recovered bank deposit slip showing a deposit of $10,000.00 in the Subject Account on June 22, 2021 at 9:31 a.m.

### *On Solutions Group LLC*

55. On Solutions Group LLC is the title owner of the Subject Account.

56. On Solutions Group LLC was incorporated as a limited liability incorporated in the State of Florida, on or about September 15, 2015.

57. Public databases indicate that Nolan LEJARDI is the President of On Solutions Group LLC.

58. According to Dun & Bradstreet website, On Solutions Group LLC is part of the consulting services industry and employs five individuals and generates annually $235,481.00 in sales revenue.

59. Transaction activity for the Subject Account from February 2020 to August 2021 demonstrate that this reported annual revenue amount is inconsistent with the amount of money flowing through the account and, in fact, reflects the following characteristics of a BMPE:

- Over $750,000.00 in structured, interstate cash deposits into the Subject Account by individuals known to HSI investigators as money couriers for DTOs;

- Over $1,500,000.00 in wire transfers to and from business entities currently under investigation by HSI for money laundering, including other businesses specifically identified in the ledger documents recovered from SOI-1 and the Co-Conspirators;

- Excessive wire transfers to entities involved in the retail of wholesale cellphones, an industry known to HSI investigators to be historically

> involved in BMPE money laundering schemes;

- Wire transfers to and from business entities spanning a variety of unrelated industries, including medical equipment, agriculture, logistics, and hospitality, a common indicator for money laundering activity; and

- Limited legitimate business activity, such as payroll and tax deductions, that are not commensurate with the large volume of financial activity occurring within the Subject Account.

60. Moreover, SOI-1, SOI-2 and CC1 did not have any legitimate income during the timeframe in which they conducted this activity. As such, there were no legitimate sources for any of the bulk cash that SOI-1, SOI-2, and CC1 deposited into the Subject Account.

### *Administrative Proceedings*

61. After the seizure of the Defendant Funds from the Subject Account, CBP initiated administrative forfeiture proceedings.

62. On or about May 25, 2022, On Solutions Group LLC filed a claim with CBP, contending that it is the owner of the Defendant Funds.

63. Pursuant to 18 U.S.C. § 983(a)(3), CBP then referred the matter for

judicial forfeiture proceedings to the U.S. Attorney's Office for the Northern District of Georgia.

## **CONCLUSION**

64. Based on the foregoing, the Defendant Funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or were intended to be furnished in exchange for a controlled substance, that they constitute proceeds traceable to such an exchange, or that they were used or were intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. §§ 841 and 846.

65. The Defendant Funds also are subject to forfeiture to the United States pursuant to 18 U.S.C. §981(a)(1)(C) because they constitute or were derived from proceeds traceable to a specified unlawful activity, namely illegal distribution of controlled substances.

66. The Defendant Funds also are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds they constitute property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and 1957 (money laundering), or is property traceable to such property.

WHEREFORE, Plaintiff prays:

(1) that the Court forfeit the Defendant Funds to the United States of America;

(2) that the Court award Plaintiff the costs of this action; and

(3) that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This 29th day of July, 2022.

Respectfully submitted,

**RYAN K. BUCHANAN**
*United States Attorney*

/s/ Radka T. Nations
**RADKA T. NATIONS**
*Assistant United States Attorney*
Georgia Bar No. 618248
600 United States Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    PLAINTIFF,<br><br>        v.<br><br>$697,165.89 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXX8543 HELD IN THE NAME OF ON SOLUTIONS GROUP LLC,<br>    DEFENDANTS. | Civil Action No |

## **VERIFICATION OF COMPLAINT FOR FORFEITURE**

I, Special Agent David Lesser, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 29th day of July, 2022.

_____
Special Agent David Lesser
Homeland Security Investigations

18